UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CLARENCE A. REED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:10-cv-1226-SEB-DKL |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY**

Clarence A. Reed ("Reed") seeks judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). See 42 U.S.C. §§ 416(i); 423(d). For the reasons detailed below, the judgment is AFFIRMED.

**Applicable Standard**

To be eligible for DIB, a claimant must prove he is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). To establish disability, the plaintiff is required to present

medical evidence of an impairment that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by a claimant's statement of symptoms." 20 C.F.R. §§ 416.908; 404.1508.

The Social Security Administration ("SSA") has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. 20 C.F.R. §§ 404.1520 and 416.924. If disability status can be determined at any step in the sequence, an application will not be reviewed further. Id. At the first step, if the claimant is currently engaged in substantial gainful activity, then he is not disabled. At the second step, if the claimant's impairments are not severe, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.924(c). Third, if the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the Administration has pre-determined are disabling. 20 C.F.R. § 404.1525. If the claimant's impairments do not satisfy a Listing, then his residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations. 20

C.F.R. §§ 404.1545 and 416.945. At the fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled. Fifth, considering the claimant's age, work experience, and education (which are not considered at step four), and his RFC, he will not be determined to be disabled if he can perform any other work in the relevant economy. The claimant bears the burden of proof at steps one through four, and at step five the burdens shifts to the Commissioner. Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). The task a court faces in a case such as this is not to attempt a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision is supported by substantial evidence and otherwise is free of legal error. Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)).

On December 8, 2006, Reed filed an application for DIB, alleging disability since December 24, 2005, due to seizures, epilepsy, hypertension, heart disease, and sleep apnea. Reed's DIB application was denied initially and upon reconsideration and he subsequently requested a hearing with an administrative law judge. On July 15, 2009, a hearing was held before the Administrative Law Judge ("ALJ"), during which Reed, who was represented by counsel, testified. At step one of the sequential evaluation process, the ALJ found that Reed had been unable to engage in substantial gainful activity since

his onset date. At step two, the ALJ found that Reed suffered from the severe impairments of seizure disorder and heart disease. At step three, the ALJ found that Reed does not have an impairment or combination of impairments that either meet or medically equal any of the conditions in the Listing of Impairments.

The ALJ found that Reed has the RFC to perform limited "light" work, with the following restrictions: lift and carry twenty pounds occasionally and ten pounds frequently and push or pull within those restrictions; no limitation on ability to sit and can stand or walk for up to six hours in an 8-hour workday; occasionally climb ramps or stairs, kneel, crouch, crawl, or stoop; frequently balance; must avoid climbing ladders, ropes, and scaffolds; avoid extreme heat, extreme cold, extreme high humidity, dangerous moving machinery, unprotected heights and unprotected bodies of water. At step four, the ALJ found that Reed is unable to perform his past relevant work, which was as a correctional officer. At step five, the ALJ found that, considering Reeds's RFC, age (59 at the hearing date), education (at least a high school education), and work experience, and relying on the Medical-Vocational Guidelines, there were a sufficient number of jobs in the national economy that Reed could perform. Therefore, the ALJ found that Reed was not disabled and not entitled to benefits.

<u>**Evidence**</u>

**Plaintiff's Medical History.** On December 24, 2005, Reed was admitted to St. John's Hospital after he experienced three syncopal episodes in the two months prior. At that time, Reed reported that he had recently suffered from brief episodes in which he lost

consciousness or felt as if he were going to lose consciousness that were preceded by nausea. A CT scan of Reed's brain was negative, except for evidence of old ischemic changes in the cerebellar region. R. at 288. An MRI of Reed's brain revealed no acute or active processes, but showed some residuals of previous ischemic type infarct over the cerebellum and small vessel ischemic change in the cerebrum. R. at 277. An EEG was negative and there was no evidence of masses or clots in Reed's brain. R. at 261, 288. Reed was diagnosed with recurrent syncope of undetermined etiology. R. at 288.

Reed was transferred from St. John's to the Heart Center of Indiana on December 27, 2005. At the Heart Center, Reed underwent a cardiac catheterization, which demonstrated 70% proximal stenosis requiring stenting. R. at 174. Reed then underwent a stenting procedure with an optimal angiographic result. Id. On December 30, 2005, Reed was discharged from the Heart Center. He was diagnosed with recurrent syncope (possible seizure disorder) and had multiple risk factors for coronary artery disease following the cardiac catheterization and stenting. Id. Reed was prescribed Trileptal, an anticonvulsant medication, to help control his seizures, and was discharged in stable condition. R. at 288-89.

On January 5, 2006, Reed saw his treating physician, George Agapios, M.D., a board-certified physician in family medicine, for a follow-up after his hospitalization.[1] Dr. Agapios diagnosed Reed with syncope and coronary artery disease and recommended

[1] Dr. Agapios had been treating Reed since March 2005.

a neurological consultation, but noted that Reed had not experienced any syncopal episodes since starting his medication. R. at 239. On Dr. Agapios's recommendation, Reed was examined by Loretta VanEvery, M.D., a neurologist, in January 2006. Reed reported that he had not experienced any episodes of nausea, alterations of consciousness, or confusion since he started taking Trileptal and Dr. VanEvery's examination did not reveal any significant abnormal findings. R. at 283. Dr. VanEvery diagnosed Reed with complex partial epilepsy and opined that he should not drive until he was seizure-free for at least two months, and that he should not climb to heights, take a tub bath, or engage in any other dangerous activities. Id.

Dr. VanEvery also expressed concern regarding Reed's ability to perform his occupation as a correctional officer. She stated that, although Reed's seizures appeared at that point to be well-controlled with Trileptal, it would be impossible to be certain that Reed would never have a breakthrough seizure. Given that his job as a correctional officer involved carrying a weapon and being around dangerous inmates, Dr. VanEvery stated that Reed might need to consider medical retirement in light of his epilepsy diagnosis. R. at 284. Dr. VanEvery recommended that Reed see James Zhang, M.D., a neurologist, for ongoing treatment. Id.

In February 2006, Reed was again examined by Dr. Agapios. At that time, Reed complained of seizures with occasional disorientation and increased fatigue. Dr. Agapios diagnosed Reed with seizure disorder. Reed was prescribed Trileptal for the seizure disorder, Vytorin, which is indicated in the treatment of hypercholesterolemia and

hyperlipidemia, and Toprol, for hypertension. R. at 237.

On February 14, 2006, Reed was seen by Dr. Zhang. Reed complained of decreased memory, headaches, and snoring at night. After examining him, Dr. Zhang diagnosed Reed with epilepsy, obstructive sleep apnea ("OSA"), and tension headaches. Dr. Zhang recommended that Reed continue to take Trileptal, that he undergo a video EEG, and that he refrain from driving. R. at 271. Reed underwent long-term video EEG monitoring for a four day period between April 24, 2006 and April 28, 2006, under the supervision of Dr. Zhang. Reed continued to take Trileptal during the observation period and the EEG monitoring did not reveal any epileptic events. R. at 275.

On March 28, 2006, at the request of Dr. Zhang, Reed was evaluated by James Milligan, M.D., a board-certified otolaryngologist. Dr. Milligan noted that Reed had a history of obstructive sleep apnea. An examination revealed moderate palate enlargement, which Dr. Milligan recommended be corrected through surgery. On June 12, 2006, Reed underwent such surgery, which included epiglottoplasty.

Reed returned to Dr. Zhang for a follow-up evaluation in May 2006. Reed reported that he had not experienced any more seizures since starting his Trileptal medication and stated that he believed his problems were due to stress from his work as a correctional officer. Reed inquired whether he could retire earlier. Dr. Zhang recommended that Reed continue to take Trileptal and that he reduce his level of stress. At that time, Dr. Zhang also indicated that Reed might benefit from early retirement from his stressful duties as a correctional officer. R. at 518.

On August 22, 2006, Reed told Dr. Zhang that he had experienced a couple of seizures after trying to reduce his dosage of Trileptal for financial reasons, but that once he resumed his prescribed dosage of the medication, he had not experienced any other epileptic episodes. Dr. Zhang recommended that Reed continue taking the prescribed dosage of Trileptal. R. at 235. On November 16, 2006, Reed reported that, although he had not experienced any more seizures since he had resumed taking the prescribed dose of Trileptal, he had been experiencing mild, partial hand tremors over the prior four years. Dr. Zhang recommended that Reed increase his dosage of Trileptal. R. at 234.

On December 14, 2006, Dr. Agapios completed a "Seizures Impairment Questionnaire" for Reed. Dr. Agapios made it clear on the form that Reed's seizure disorder was primarily being treated by a neurologist. However, Dr. Agapios stated that Reed had complex partial seizures with his most recent seizures occurring on December 8, 2006, September 13, 2006, and February 10, 2006. R. at 326. Dr. Agapios also noted that Reed's seizures were associated with loss of consciousness and an inability to always take safety precautions before a seizure occurred, that the seizures did not occur at any particular time of the day, that they were associated with urinary or fecal incontinence, and that they were followed by a period of about an hour of "feeling drunk" and disoriented. R. at 326-27. Reed's seizures were exacerbated by stress or when he forgot to take his medication. R. at 326. Dr. Agapios opined that Reed's prognosis was poor at his job as a correctional officer and that Reed was unable to perform jobs that required him to work at heights or with machines that required an alert operator and that working

around dangerous individuals would exacerbate his stress, which would cause increased seizure activity. Thus, Dr. Agapios opined that Reed would need a low stress environment in which to work and that he would be absent from work, on average, more than three times a month as a result of his impairments and/or treatment. R. at 329.

In January 2007, Dr. Zhang completed a narrative report regarding Reed's epilepsy. Dr. Zhang stated that Reed's seizures were manifested as a loss of consciousness followed by confusion, disorientation, and headache. Dr. Zhang also stated that Reed complained of poor memory. In that report, Dr. Zhang noted that Reed had been prescribed Trileptal, which had helped decrease the seizures, but had not eliminated them. Dr. Zhang indicated that he had advised Reed not to drive and had recommended that he avoid climbing, operating heavy machinery, and swimming. Dr. Zhang also stated that Reed's job as a correctional officer was demanding and that the stress could make his seizures worse. Finally, Dr. Zhang opined that Reed was disabled and could not work for at least twelve months. R. at 351.

Also in January 2007, Dr. Zhang completed a "Seizures Impairment Questionnaire" form provided by Reed's attorney. Dr. Zhang reported that Reed had epilepsy with complex partial seizures with or without secondary generalization, citing the EEG completed on December 27, 2005 in support of the diagnosis. R. at 352. Reed's seizures were described as lasting up to forty-five minutes if not generalized, exacerbated by stress, and accompanied by confusion, disorientation, and headaches. R. at 253. Although Dr. Zhang indicated that Reed experienced seizures once or twice per month, he

also reported that Reed had not experienced a seizure since August 2006. Id. Dr. Zhang stated that Reed's symptoms were sufficiently severe to periodically interfere with his attention and concentration and that Reed could not work at heights, work with heavy machinery that required an alert operator, or operate a motor vehicle. R. at 354-56. Dr. Zhang opined that Reed was capable of performing low stress work, but that he would need to take breaks to rest at unpredictable intervals during an 8-hour workday and that he would likely be absent from work about once a month due to his condition. R. at 355-56. Finally, Dr. Zhang stated that Reed's impairment was likely to produce "good" and "bad" days. R. at 356.

On February 12, 2007, Reed returned to Dr. Zhang for a follow-up examination. At that time, Reed reported that he had not had any grand mal seizures but that he experienced occasional "dizziness" and a "spinning sensation" approximately one to two times per month when he was stressed. R. at 525-26. Dr. Zhang's neurological and motor examinations were within normal limits and he recommended that Reed continue taking Trileptal. R. at 525.

On February 28, 2007, Reed presented to Dr. Wail Bakdash for a consultative medical examination. Reed reported a history of coronary artery disease with stent placement, sleep apnea, and seizures, but stated that he had not had a seizure in the three months prior to the examination. R. at 313. Dr. Backdash diagnosed Reed with a history of epilepsy, hypertension, coronary artery disease, sleep apnea, and hyperlipidemia. R. at 314. Dr. Backdash's physical examination did not reveal any significant clinical findings.

He opined that Reed was able to sit, stand, and walk normally, that Reed could grasp, lift, carry, and manipulate objects in both hands and perform repeated movements with both feet, and that Reed was able to bend over without restriction and squat normally. R. at 314. Dr. Backdash did not offer an opinion as to restrictions or limitations related to Reed's seizure disorder. Id.

On March 13, 2007, Reed was evaluated by V. Michael Bournique, M.D., a board-certified cardiologist. Reed complained of chest pain and difficulty breathing with exertion. Dr. Bournique recommended a Cardiolite stress test. R. at 461-62. On March 29, 2007, Dr. Bournique noted that a stress study showed possible basal inferolateral ischemia with an ejection fraction of 50%. R. at 458.

Dr. J. Sands, a state agency reviewing physician, offered his opinion in March 2007 that Reed was able to lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. R. at 317. Dr. Sands further opined that Reed could frequently climb ladders and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds, and that, in light of his seizure disorder, Reed should avoid concentrated exposure to workplace hazards, such as machinery and heights. R. at 318, 320. In April 2007, Dr. Fernando Montoya, another state agency reviewing physician, affirmed Dr. Sands opinion. R. at 420.

In May 2007, Reed told Dr. Zhang that he was doing "pretty good" and that he was not having any more seizures, but that he experienced occasional spinning sensations

that lasted for one or two minutes and occurred approximately twice per month. Dr. Zhang recommended that Reed continue taking Trileptal. R. at 526. In February 2008, Reed again saw Dr. Zhang and reported that he had not experienced any passing out spells and that his hand tremors were better. Reed stated that he still experienced occasional dizziness. Dr. Zhang again recommended that Reed continue taking Trileptal. R. at 647.

On April 17, 2008, Reed started treatment at the Veterans Affairs Medical Center ("VAMC") because he was no longer able to afford his medications from his private health care providers. Reed stated that he had still been taking his Trileptal because he had received a lot of samples, but that his supply would run out the next day. Reed complained of lightheadedness when he stood up in the mornings and a brief episode in which the right side of his face and upper extremity felt slightly numb which was accompanied by a headache. He reported that his last seizure had occurred more than one year prior. R. at 625. A CT scan of Reed's brain revealed no acute intracranial abnormality. The attending physician diagnosed a history of coronary artery disease status-post stent placement, a history of seizures, and hyperlipidemia. R. at 627.

Reed came to the neurology clinic at the VAMC in June 2008 for an initial consultation regarding his seizure disorder. Reed reported that he had experienced approximately ten seizures over a two to three day hospital stay in December 2005, during which he thought he lost consciousness, but that he had not lost consciousness from a seizure since mid-2006. R. at 612. The attending physician's neurological and

motor examinations were unremarkable. The attending physician noted that Reed had been off his Trileptal medication for two months and, while Reed reported that he had experienced some tremors in his left hand and some feelings of lightheadedness, he had not suffered any seizures during that time. Id. Because Reed had been off Trileptal for two months without incident, the attending physician recommended that Reed switch to Keppra, another medication indicated for the treatment of seizures, because it required less frequent dosages. R. at 613.

On September 24, 2008, Reed returned to the VAMC neurology clinic for a follow-up appointment. Reed reported that he had experienced mild lateral chest pain during the few weeks prior to the examination, but that he no longer experienced any such pain. He stated that he had one aura episode approximately one month earlier, but that he had not experienced any seizures. Reed stated that he was comfortable with the treatment and his Keppra prescription was renewed. R. at 597. At his next visit, on October 29, 2008, Reed complained of increased irritability and an increase in the number of headaches he experienced since he began taking Keppra. Toan R. Vu, M.D., a board-certified internist, noted that Reed had not experienced any seizures during the past year and advised Reed to decrease his dose of Kappra, as irritability and headaches could possibly be side effects of the medication. R. at 593. On February 11, 2009, Reed reported that he still had one aura episode approximately every three months, but that he had not experienced any seizures. The attending physician recommended that Reed continue taking Keppra at the lower dosage.

In February 2009, Reed presented to Dr. Vu for a follow-up appointment. Reed reported that the decreased Keppra dosage resulted in improvements in his irritability and frequency of headaches. Reed had not experienced any new seizures and he also denied having any new symptoms of headaches, syncope, vision disturbances, or irritable behavior. However, Reed reported that he had recently experienced an episode of severe chest pain that dissipated rather quickly, but caused him to have to sit down. R. at 722. Reed stated that, since that time, he had been able to play video games without experiencing any similar chest pain symptoms. Dr. Vu recommended that Reed undergo a stress test. R. at 723-24. A stress test was performed on March 25, 2009, which revealed periods of significant dyspnea (labored or difficult breathing) and shoulder discomfort. R. at 720-21.

Dr. Vu completed a "Cardiac Impairment Questionnaire" dated April 28, 2009. On that form, Dr. Vu indicated that Reed had been diagnosed with coronary artery disease and that his prognosis was good. Clinical findings included chest pain, shortness of breath, fatigue, dizziness, and sweatiness. Dr. Vu indicated that Reed's primary symptoms, to wit, chest pain and discomfort associated with shortness of breath, were exacerbated by stress, physical exertion, and cold and hot weather. R. at 682-83. Dr. Vu opined that Reed could sit for 8 hours and stand and/or walk for one hour in an 8-hour work day, that he could lift up to 50 pounds occasionally and up to 10 pounds frequently, that he should avoid temperature extremes, humidity, fumes, gases, dust, and heights, and that he could not perform any kneeling, bending, or stooping. R. at 684-86. Dr. Vu

further opined that Reed was only capable of low stress work because stress increased his symptoms. R. at 686.

On April 29, 2008, after reviewing the results of Reed's March 2009 stress test, Dr. Vu opined that there was no evidence of inducible ischemia. R. at 718. At that time, Reed reported that he had not experienced any episodes of chest pain since his prior visit, but complained of mild tightness in his chest. Reed denied having any radiation of chest tightness, any associated shortness of breath, palpitations, or dizziness. Reed stated that he felt his stamina was improving and that he was walking 1 to 1.5 miles per day with his dog. Dr. Vu noted that Reed's cardiac symptoms were mild and that he had a good degree of exercise capacity that was continuing to improve. With regard to his epilepsy, Reed reported that he had not experienced any further seizures and that he no longer had headaches or increased irritability on his lower dosage of Keppra. R. at 717.

**Medical Expert Testimony.** Paul Boyce, M.D., provided expert medical testimony at Reed's administrative hearing. Dr. Boyce testified that the record indicated that Reed's impairments included a history of coronary artery disease, a history of seizures, obstructive sleep apnea, back pain, and obesity. R. at 61, 64, 66. With regard to the Reed's epilepsy, Dr. Boyce testified that diagnostic testing did not reveal evidence of a seizure focus and that the medical treatment notes in the record indicated that Reed had not experienced any seizures while on medication and that Reed's seizure disorder had not occurred with any frequency since August 2006 when Reed had attempted to reduce the dosage of his prescribed Trileptal medication. R. at 64, 66.

At the hearing, Dr. Boyce testified that Reed was capable of lifting and/or carrying 20 pounds occasionally and 10 pounds frequently, standing and/or walking for up to 6 hours per 8-hour workday, and sitting without restriction. Dr. Boyce opined that, based on Reed's cardiac issues, he was limited to light exertional work with only occasional climbing of ramps and stairs, kneeling, crouching, crawling, and stooping, and infrequent balancing. Because of Reed's history of coronary artery disease, Dr. Boyce also stated that he (Reed) should avoid extremes of heat, cold, and high humidity. Dr. Boyce further testified that, in light of Reed's history of seizures, he could not climb ropes, ladders or scaffolds, and that he needed to avoid dangerous moving machinery, unprotected heights, and unprotected bodies of water. R. at 67-68.

**Vocational Expert Testimony.** Ray Burger, a vocational expert, testified at Reed's administrative hearing that an individual who was limited to light work with the restrictions identified by Dr. Boyce would be capable of performing the job of a security guard and that there were 3,450 such positions in the State of Indiana. R. at 69-70. However, Mr. Burger also testified that, if an individual was unable to handle stressful situations, he would be unable to work as a security guard. R. at 73-74.

**Plaintiff's Testimony.** At the administrative hearing, Reed testified that, while he no longer experienced seizures, he continued to have auras two to three times per month. During these episodes, Reed stated that he became dizzy and felt lightheaded and "tingly." In order to prevent a seizure from following the aura, Reed testified that his doctors had instructed him to sit down and relax or sleep, if possible. According to Reed,

his auras usually occurred when he was frustrated or angry, that they lasted anywhere from 15 to 20 minutes and that he needed to rest for approximately 30 minutes before he recovered. R. at 71. Reed stated that he would be unable to perform a job as a security guard because he would need to leave his post to reset whenever he experienced an aura and that he would useless if anyone tried to break-in because he had back problems and anger issues. R. at 72.

Reed reported that his activities of daily living included cleaning his house, doing laundry, and caring for a dog, and that he also painted ceramics at his home as a hobby. He shared responsibilities with his son washing the dishes and cooking. Reed testified that he was able to drive a motor vehicle, but not more than five or six miles at a time. Finally, Reed stated that he had to reduce the dosages of his medications because they otherwise caused the side-effect of extreme anger. R. at 56-59.

## Discussion

Reed contends that the ALJ erred in determining his RFC by improperly discounting the opinions of the treating sources who opined that he was only capable of handling "low stress" work. Reed also argues that the ALJ improperly evaluated his credibility. Finally, Reed contends that the ALJ erred by relying on incomplete testimony from the vocational expert at Step 5. We address these arguments in turn.

**Treating Physician Rule.** Reed contends that in this case the ALJ erred when making his RFC assessment by failing to properly consider the opinions of Reed's treating physicians. According to Reed, the critical distinction between the opinions of

his treating physicians and the ALJ's RFC determination relates to whether he is able to perform stressful work. Reed's treating sources – Drs. Vu, Zhang, and Agopios – each opined that Reed is limited to low stress work. However, the ALJ did not include such a limitation in his RFC, instead giving significant weight to the opinion of the non-examining medical expert, Dr. Boyce, who opined regarding Reed's work capacity and functional limitations, but did not provide an opinion as to the level of stress Reed could handle in the workplace.

Under SSA rules, if an ALJ fails to give a treating source's opinion "controlling weight," the ALJ's written decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers ... the reasons" why the ALJ discounted the opinion. SSR 96-2p. Here, the ALJ provided an adequate explanation for his decision affording Reed's treating sources less weight. In his decision, the ALJ noted that he had given less weight to the opinions of the treating physicians because they either focused largely on the December 2005 episode, which occurred before Reed began taking medication to treat his seizure disorder, or on his symptoms in August 2006, which was near the time that he reduced his medication dosage without consulting his physicians. The treatment notes in the record indicate that once Reed again began taking the full dosage of his medication, he did not suffer another seizure. In light of these facts, it was reasonable for the ALJ to give lesser weight to the treating sources' opinions about Reed's RFC and to conclude that not all of the

limitations endorsed by Reed's treating physicians were supported by medical evidence.

In his decision, the ALJ specifically addressed the opinions of Drs. Vu, Zhang, and Agopios regarding Reed's ability to handle stress. Each of the doctors completed impairment questionnaire forms for Reed that addressed a range of issues pertaining to his residual functional capacity. One of the questions dealt with the degree to which Reed could handle work stress. Each of the three treating physicians checked a box to indicate that he was only capable of performing "low stress" work. The ALJ noted that Reed's treating sources had so opined, but concluded from the narrative portions of the doctors' opinions that their concerns were related to Reed's past work as a corrections officer. This conclusion is supported by substantial evidence. For example, Dr. Agapios explained that Reed had reported a "loss of function" with moderate to high stress, noting that "[b]eing around dangerous people[2] increases stress which precipitates seizures." R. at 328. In a narrative letter, Dr. Zhang stated that Reed's "job [as a correctional officer] is very demanding and the stress can make his seizure worse." R. at 351. Dr. Zhang's treatment notes also indicate that Reed had reported that he believed that the stress from his past work as a correctional officer had contributed to his seizure problems. R. at 518.

Because the opinions of Reed's treating physicians appear to be based on events which occurred before he had initiated medication therapy and there is no evidence in the record that he suffered a seizure as a result of stress once he began treatment, we find that

[2] Presumably this refers to the conditions of Reed's work as a correctional officer.

substantial evidence supports the ALJ's conclusion that a limitation to low stress work was not supported by the medical evidence as well as his decision to instead give greater weight to the testimony of the medical expert, Dr. Boyce, in assessing Reed's RFC.

Reed argues that in making the RFC determination the ALJ improperly took Dr. Boyce's silence on Reed's ability to tolerate stress to be an opinion that Reed had no restrictions in this area. It is true that an ALJ errs when he interprets a doctor's silence as support for a finding that the claimant suffers from no functional limitations in circumstances in which the doctor does not render any opinion whatsoever about the claimant's work capacity. See, e.g., Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001); Rosa v. Callahan, 168 F.3d 72, 82 (2d Cir. 1999); Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989). Here, however, Dr. Boyce provided a detailed opinion about Reed's work capacity and opined as to the functional limitations he believed were supported by the medical evidence of record. R. at 67-68. In these circumstances, where Dr. Boyce addressed various functional limitations that he did believe were supported by the medical evidence and did not include a limitation as to stress, it is an indication that he did not believe such a limitation was warranted. While an ALJ may not "play doctor" by substituting his opinion for that of a physician, it is the duty of the ALJ to weigh the evidence and make reasonable inferences from the record. See Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004); Blakes ex rel. Wolfe v. Barnhart, 331 F.3d 565, 570 (7th Cir. 2003). For the reasons detailed above, we find that the there is substantial evidence to support the ALJ's RFC assessment and that the ALJ adequately explained his reasons

for discounting the opinions of Reed's treating physicians and instead giving substantial weight to Dr. Boyce's testimony.

**Credibility Determination.** Reed next contends that the ALJ improperly determined that his allegations of disability were not credible. We review an ALJ's credibility determination deferentially, in light of the fact that the ALJ is in the best position to evaluate an applicant's credibility. Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009) (citation omitted). We reverse such a determination "only if it is so lacking in explanation or support that we find it 'patently wrong.'" Id. (quoting Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008)).

Reed first contends that the ALJ erred in his credibility determination by improperly discounting Reed's allegations that he is intolerant of stress and by failing to cite to any evidence to contradict such allegations. However, Reed has failed to point us to a place in the record where he testified that he was unable to handle stress in the working environment. When asked during his administrative testimony why he would be unable to perform a job as a security guard, Reed did not mention the stress related to such a position, but rather that he would need to be able to sit down if he experienced an aura of a seizure and that he would not be able to physically restrain someone. Because Reed did not testify regarding his ability (or lack thereof) to handle a stressful working environment, we cannot find that the ALJ erred by failing to address as part of his credibility analysis an allegation that was never made by the Plaintiff during his administrative testimony.

Reed also cites the ALJ's determination that Reed's assertions about his limitations "are not credible to the extent they are inconsistent with the above residual functional capacity assessment," arguing that such a conclusion is merely "boilerplate." It is true that, under Seventh Circuit law, such boilerplate language, by itself, is inadequate to support a credibility finding. See, e.g., Punzio v. Astrue, 630 F.3d 704, 709 (7th Cir. 2011). Here, however, the ALJ provided specific reasons to support his adverse credibility finding that are supported by the record. For example, the ALJ pointed to the fact that, although Reed testified that he was functionally limited by "problems with [his] back," the medical records did not show consistent reporting of back problems during the relevant time period, there was no evidence that Reed pursued treatment for his back during the relevant time period, and the consultative physical examination indicated that Reed had normal strength and sensation, full range of motion, and no tenderness in his spine, and that he was able to sit, stand, bend, squat, and walk normally.

In assessing Reed's credibility, the ALJ also cited to the fact that Reed's seizures were well controlled by medication and that his symptoms were relatively infrequent, which belied his allegations of disability due to his seizure disorder. Reed argues that the ALJ erred by failing to consider his testimony that, although he no longer had seizures at the time, he continued to have auras two to three times a month that required him to sit down or sleep if possible to prevent a full blown seizure. He testified that these episodes lasted about 15 to 20 minutes during which he felt dizzy, lightheaded, and "tingly." Contrary to Reed's contention, the ALJ did note Reed's complaints of dizziness in his

credibility analysis and took account of that testimony in assessing Reed's RFC by limiting him to a range of work that did not involve climbing ladders, ropes, and scaffolds and did not involve exposure to dangerous moving machinery, unprotected heights, and unprotected bodies of water. Based on the objective evidence, however, the ALJ reasonably concluded that Reed's reports of occasional dizziness were not entirely credible insofar as establishing proof of his inability to work.

Finally, in making his credibility determination, the ALJ determined that Reed was active to an extent inconsistent with his allegations of disability. Specifically, the ALJ pointed to Reed's report that he played active "Wii" video games including tennis and bowling without chest pain or other heart problems, and that, despite his reported seizure disorder, he continued to drive short distances. Reed argues that the ALJ placed undue weight upon his performance of these daily activities in making his credibility determination. Although we agree that Reed's testimony regarding his daily activities by itself would likely be insufficient to support an adverse credibility finding, for the reasons detailed above, the ALJ's determination was based on much more than this testimony alone. The ALJ cited various medical reports to support his conclusions and sufficiently explained which of Reed's statements he did not credit and why. Accordingly, we find that the ALJ provided an adequate basis for his credibility assessment.

**Step Five Finding.** Reed contends that the ALJ's finding at step five is not supported by substantial evidence because the ALJ did not include a limitation to low

stress work in the hypothetical question he posed to the vocational expert.[3] However, the ALJ is only required to include in his hypothetical question those impairments and limitations that he finds credible. See Schmidt v. Astrue, 496 F.3d 833, 845-46 (7th Cir. 2007). For the reasons discussed above, we have found that the ALJ reasonably declined to adopt a limitation to low stress work in his RFC finding because such limitation was either not supported by the medical evidence or was based only on his past work as a correctional officer. Thus, the ALJ was not required to include such a limitation in his hypothetical presented to the vocational expert. Accordingly, we find no error in the ALJ's analysis at step five.

**Conclusion**

For the reasons detailed above, the conclusion reached by the ALJ is supported by substantial evidence. Accordingly, the decision of the ALJ is AFFIRMED.

IT IS SO ORDERED.

Date: 02/23/2012

Sarah Evans Barker

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

[3] The vocational expert opined that Reed could perform the job of security officer, which requires the ability to perform effectively under stress.

Copies to:

Charles E. Binder
BINDER AND BINDER
fedcourt@binderandbinder.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Eddy Pierre Pierre
LAW OFFICES OF HARRY J. BINDER AND CHARLES E. BINDER, P.C.
fedcourt@binderandbinder.com

SSA (Court Use Only)
SOCIAL SECURITY ADMINISTRATION (SSA) added for
email notification purposes to the SSA General Counsel,
pursuant to A.O. memorandum of 7/19/2007.
.NULL.